Nos. 18-1809 & 18-1821

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

———————————————

HYUNG SEOK KOH, and
EUNSOOK KOH,

*Plaintiffs-Appellees*,

*v.*

JOHN USTICH, MARK GRAF,
and SUNG PHIL KIM,

*Defendants-Appellants*.

———————————————

Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:11-cv-2605—Edmond E. Chang, *Judge*.

---

**RESPONSE BRIEF OF PLAINTIFFS-APPELLEES
HYUNG SEOK KOH AND EUNSOOK KOH**

---

Arthur Loevy
Jon Loevy
Tony Balkissoon*
Scott Drury
Steven Art
Loevy & Loevy
311 N. Aberdeen St.
Third Floor
Chicago, Illinois 60607
(312) 243-5900
tony@loevy.com

*Counsel of Record*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-1809 & 18-1821

Short Caption: Hyung Seok Koh, et al. v. John Ustich, et al.

  To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

  The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

> **[  ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Hyung Seok Koh & Eunsook Koh

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy

Law Offices of Elliot R. Zinger & Associates

(3)  If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

N/A

  ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Arthur Loevy     Date: December 19, 2018

Attorney's Printed Name: Arthur Loevy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No  X

Address: Loevy & Loevy, 311 N. Abeerdeen St., Third Floor

Chicago, Illinois 60607

Phone Number: (312) 243-5900     Fax Number: (312) 243-5902

E Mail Address: arthur@loevy.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>18-1809 & 18-1821</u>

Short Caption: <u>Hyung Seok Koh, et al. v. John Ustich, et al.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Hyung Seok Koh & Eunsook Koh

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy

Law Offices of Elliot R. Zinger & Associates

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: <u>s/ Jon Loevy</u>                              Date: <u>December 19, 2018</u>

Attorney's Printed Name: <u>Jon Loevy</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes _____    No <u>X</u>

Address: <u>Loevy & Loevy, 311 N. Abeerdeen St., Third Floor</u>

<u>Chicago, Illinois 60607</u>

Phone Number: <u>(312) 243-5900</u>                    Fax Number: <u>(312) 243-5902</u>

E Mail Address: <u>jon@loevy.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>18-1809 & 18-1821</u>

Short Caption: <u>Hyung Seok Koh, et al. v. John Ustich, et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Hyung Seok Koh & Eunsook Koh

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy

    Law Offices of Elliot R. Zinger & Associates

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

       N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

       N/A

Attorney's Signature: <u>s/ Steven Art</u>        Date: <u>December 19, 2018</u>

Attorney's Printed Name: <u>Steven Art</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes _____   No <u>X</u>

Address: <u>Loevy & Loevy, 311 N. Abeerdeen St., Third Floor</u>

        <u>Chicago, Illinois 60607</u>

Phone Number: <u>(312) 243-5900</u>     Fax Number: <u>(312) 243-5902</u>

E Mail Address: <u>steve@loevy.com</u>

rev. 01/15 GA

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>18-1809 & 18-1821</u>

Short Caption: <u>Hyung Seok Koh, et al. v. John Ustich, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Hyung Seok Koh & Eunsook Koh

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy

    Law Offices of Elliot R. Zinger & Associates

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any; and

        N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

Attorney's Signature: <u>s/ Scott Drury</u>        Date: <u>December 19, 2018</u>

Attorney's Printed Name: <u>Scott Drury</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes \_\_\_\_\_    No <u>X</u>

Address: <u>Loevy & Loevy, 311 N. Abeerdeen St., Third Floor</u>

        <u>Chicago, Illinois 60607</u>

Phone Number: <u>(312) 243-5900</u>      Fax Number: <u>(312) 243-5902</u>

E Mail Address: <u>drury@loevy.com</u>

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 18-1809 & 18-1821

Short Caption: Hyung Seok Koh, et al. v. John Ustich, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Hyung Seok Koh & Eunsook Koh


(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy

Law Offices of Elliot R. Zinger & Associates


(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

   N/A

Attorney's Signature: s/ Tony Balkissoon          Date: December 19, 2018

Attorney's Printed Name: Tony Balkissoon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** X   **No** _____

Address: Loevy & Loevy, 311 N. Abeerdeen St., Third Floor

Chicago, Illinois 60607

Phone Number: (312) 243-5900          Fax Number: (312) 243-5902

E Mail Address: tony@loevy.com

rev. 01/15 GA

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................... 1

ISSUES PRESENTED ................................................................................. 3

STATEMENT OF THE CASE ....................................................................... 4

   I.    THE KOHS ....................................................................................... 5

   II.   PAUL'S SUICIDE .............................................................................. 5

   III.  DEFENDANTS ARREST THE KOHS ................................................. 6

        A.    The Kohs Are Immediately Arrested at Home ................................ 6

        B.    Defendants Concede They Lacked Probable Cause ......................... 6

        C.    The Kohs Are Held *Incommunicado* .................................................. 7

   IV.  APPELLANTS INTERROGATE MR. KOH ......................................... 7

        A.    Koh's Mental and Physical Vulnerabilities ..................................... 7

        B.    The Language Barrier ....................................................................... 8

        C.    Koh Is Not Allowed to Contact His Attorney ................................. 10

        D.    Appellants Do Not Give Koh *Miranda* Warnings ........................... 10

        E.    Koh Truthfully Denies That He Killed His Son ............................ 11

        F.    Koh Is Held In Isolation Again ...................................................... 11

        G.    Appellants Decide to Extract a Confession .................................... 12

        H.    Appellants Use Coercive Tactics .................................................... 13

        I.    Appellants Exploit the Language Barrier ...................................... 15

        J.    Appellants Exploit Koh's Mental and Physical
            Vulnerabilities ................................................................................ 16

        K.    Appellants Bar Koh's Attorney from the Room .............................. 17

        L.    His Will Overborne, Koh Makes Incriminating Statements .......... 18

   V.   KOH'S CRIMINAL PROCEEDINGS ............................................... 19

   VI.  THE DISTRICT COURT'S DECISION ........................................... 19

SUMMARY OF THE ARGUMENT ............................................................ 20

ARGUMENT ............................................................................... 22

I.    STANDARDS OF REVIEW ............................................... 22

II.   THIS COURT SHOULD DISMISS FOR LACK OF JURISDICTION ......... 22

    A.   Jurisdictional Limits in Qualified-Immunity Appeals ................... 23

    B.   Stipulating to Facts to Secure Jurisdiction ..................................... 24

    C.   Appellants Present Factual Challenges, Not Legal Issues ............ 25

    D.   This Court Should Dismiss the Appeals ......................................... 31

III.  ACCEPTING KOH'S FACTS, APPELLANTS COERCED KOH TO INCRIMINATE HIMSELF IN VIOLATION OF CLEARLY ESTABLISHED LAW ....................................................................... 32

    A.   Legal Standards .................................................................................... 33

    B.   Appellants Violated Koh's Fifth Amendment Rights ..................... 38

        1.   Several Factors Known to Appellants Rendered Koh Unusually Susceptible to Psychological Pressure ................... 38

        2.   Appellants' Coercive Tactics Resulted in Koh's Involuntary Confession ................................................................ 40

        3.   Kim's Arguments Are Unpersuasive ...................................... 44

    C.   Prior to Koh's Interrogation, It Was Clearly Established that Interrogators Could Not Deploy Appellants' Barrage of Coercive Tactics on a Vulnerable Person ........................................ 46

IV.  APPELLANTS' CAUSATION ARGUMENT IS UNRELATED TO QUALIFIED IMMUNITY AND IS MERITLESS ......................................... 48

CONCLUSION ............................................................................... 49

# TABLE OF AUTHORITIES

Cases

*Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir. 2011) ...................... 32, 36

*Alexander v. DeAngelo*, 329 F.3d 912 (7th Cir. 2003)................................................. 37

*Andersen v. Thieret*, 903 F.2d 526 (7th Cir. 1990) .................................................... 32

*Arizona v. Fulminante*, 499 U.S. at 287................................................................. 37, 43

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ...................................................... 48

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................... 24, 31

*Behrens v. Pelletier*, 516 U.S. 299 (1996) .............................................................. 24, 32

*Blackburn v. Alabama*, 361 U.S. 199 (1960)........................................................... 34, 41

*Bram v. United States*, 168 U.S. 532 (1897) ............................................................... 33

*Brown v. Mississippi*, 297 U.S. 278 (1936) ................................................................ 33

*Carrion v. Butler*, 835 F.3d 764 (7th Cir. 2016) ...................................................... 32, 45

*Chambers v. Florida*, 309 U.S. 227 (1940)............................................................... 38, 43

*Cohen v. Beneficial Loan Corp.*, 337 U.S. 542 (1949)............................................... 23

*Colorado v. Connelly*, 479 U.S. 157........................................................................... 35

*Conner v. McBride*, 375 F.3d 643 (7th Cir. 2004) ....................................................... 34

*Culombe v. Connecticut*, 367 U.S. 568 (1961) ................................................. 35, 41, 43

*Cunningham v. Hamilton County*, 527 U.S. 198 (1999)............................................. 32

*Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017) ...................................................... 47

*Davis v. North Carolina*, 384 U.S. 737 (1966) ........................................................... 34

*Dennis v. Sparks*, 449 U.S. 24 (1980)......................................................................... 49

*Dickerson v. United States*, 530 U.S. 428 (2000) ........................................ 47

*Digital Equipment Corp. v. Desktop Direct*, 511 U.S. 863 (1994) ............................. 23

*Edwards v. Arizona*, 451 U.S. 477 (1981) ........................................... 36, 41

*Estelle v. Smith*, 451 U.S. 454 (1981) ................................................. 44

*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006) .................................... 49

*Fare v. Michael C.*, 442 U.S. 707 (1979) ............................................ 41

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ................................... 49

*Fikes v. Alabama*, 352 U.S. 191, 195 (1957) ................................... 36, 37, 41

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) ............................. 47

*Greenwald v. Wisconsin*, 390 U.S. 519 (1968) ....................................... 35

*Gutierrez v. Kermon*, 722 F.3d 1003 (7th Cir. 2013) ................................ 24

*Haynes v. Washington*, 373 U.S. 503 (1963) ................................... passim

*Hill v. Coppelson*, 627 F.3d 601 (7th Cir. 2010) ..................................... 25

*Hope v. Pelzer*, 536 U.S. 730 (2002) ................................................ 33

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ................................... passim

*Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018) ............................... passim

*Jacobs v. Chicago*, 215 F.3d 758, 766–67 (7th Cir. 2000) ........................... 33

*Johnson v. Jones*, 515 U.S. 304 (1995) ................................. 22, 23, 24, 31

*Johnson v. Winstead*, 900 F.3d 428 (7th Cir. 2018) ................................. 36

*Jones v. Clark*, 630 F.3d 677 (2011) ................................... 23, 24, 32

*Levan v. George*, 604 F.3d 366 (7th Cir. 2010) ..................................... 25

*Livers v. Schenck*, 700 F.3d 340 (8th Cir. 2012) .................................... 41

*Malley v. Briggs*, 475 U.S. 335 (1986) ......................................................... 49

*Malloy v. Hogan*, 378 U.S. 1 (1964) ............................................... 34, 37, 39

*Manuel v. City of Joliet*, 137 S.Ct. 911 (2017) ........................................ 49

*Martinez Camargo v. I.N.S.*, 282 F.3d 487 (7th Cir. 2002) ..................... 46

*Michigan v. Moseley*, 423 U.S. 96 (1975) ................................................ 36

*Michigan v. Tucker*, 417 U.S. 433 (1974) ................................................ 43

*Miller v. Fenton*, 474 U.S. 104 (1985) ..................................................... 33

*Mincey v. Arizona*, 437 U.S. 385 (1978) ............................................ 35, 40

*Miranda v. Arizona*, 384 U.S. at 468 (1966) ........................................... 43

*Missouri v. Seibert*, 542 U.S. 600 (2004) ................................................ 41

*Mitchell v. Forsyth,* 472 U.S. 511 (1985) .......................................... 23, 24

*Muratoski v. Holder*, 622 F.3d 824 (7th Cir. 2010) ................................. 22

*Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005) ....................................... 48

*Oregon v. Elstad*, 470 U.S. 298 (1985) .................................................... 36

*Orozco v. Texas*, 394 U.S. 324 (1969) ..................................................... 36

*Ortiz v. Jordan*, 562 U.S. 180 (2011) ......................................... 24, 48, 49

*Payne v Arkansas*, 356 U.S. 560 (1958) ................................................. 34

*Rogers v. Richmond*, 365 U.S. 534 (1961) ............................................... 34

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) .................................... 34

*Smith v. Illinois*, 469 U.S. 91 (1984) ...................................................... 41

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ......... passim

*Sotelo v. Indiana State Prison*, 850 F.2d 1244 (7th Cir. 1988) ............... 37

*Spano v. New York*, 360 U.S. 315, 322 (1959) ................................................ 37, 42, 43

*Sprosty v. Buchler*, 79 F.3d at 646 ...................................................... 36, 41

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ........................................ 49

*Strand v. Minchuk*, --- F.3d ---, 2018 WL 6432960 (7th Cir. Dec. 6, 2018) ..... 5, 23, 24

*Tolan v. Cotton*, 572 U.S. 650 (2014) ................................................. 24

*United States v. Botello-Rosales*, 728 F.3d 865 (9th Cir. 2013) ................................. 41

*United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996) ............................................. 35, 39

*United States v. Huerta*, 239 F.3d 865 (7th Cir. 2001) ........................................ 35, 36

*United States v. Lanier*, 520 U.S. 259 (1997) ................................................... 45

*United States v. Perez-Lopez*, 348 F.3d 839 (9th Cir. 2003) ...................................... 41

*United States v. Romo-Chavez*, 681 F.3d 955 (9th Cir. 2012) ................................... 45

*United States v. Sablotny*, 21 F.3d 747 (7th Cir. 1994) .................................... 35, 37, 38

*United States v. Serlin*, 707 F.2d 953 (7th Cir. 1983) .......................................... 36, 40

*United States v. Short*, 790 F.2d 464 (6th Cir. 1986) ................................................ 41

*United States v. Stott*, 245 F.3d 890 (7th Cir. 2001) .............................................. 35

*Watts v. Indiana*, 338 U.S. 49 (1949) ......................................................... 34

*Weidner v. Thieret*, 866 F.2d 958 (7th Cir. 1989) ......................................... 34, 37, 43

*White v. Gerardot*, 509 F.3d 829 (7th Cir. 2007) ................................................ 25

*Whitlock v. Brueggermann*, 682 F.3d 567 (7th Cir. 2012) .................................... 25, 49

Statutes

28 U.S.C. §1291 .................................................................................... 4

28 U.S.C. §1331 .................................................................................... 1

28 U.S.C. §1367.................................................................................................... 1

42 U.S.C. §1983.................................................................................................... 1

## JURISDICTIONAL STATEMENT

Appellants' jurisdictional statements are not complete or correct. This Court lacks jurisdiction.

Plaintiffs-Appellees Hyung Seok Koh and Eunsook Koh sued Defendants-Appellants Mark Graf, John Ustich, and Sung Phil Kim, as well as defendants who are not parties on appeal: the Villages of Northbrook and Wheeling, and other police. R.1.[1] The Kohs asserted constitutional claims, 42 U.S.C. §1983, and Illinois torts. *Id*. The district court had jurisdiction over the federal claims under 28 U.S.C. §1331 and exercised supplemental jurisdiction over the state-law claims under 28 U.S.C. §1367.

The Kohs amended their complaint twice. R.40, 133. In the operative complaint, they asserted the defendants arrested and detained them without probable cause, in violation of the Fourth Amendment; coerced Mr. Koh to incriminate himself, in violation of the Fifth and Fourteenth Amendments; fabricated evidence, in violation of due process; conspired to violate the Kohs' rights and failed to intervene to stop those violations; maliciously prosecuted Mr. Koh; intentionally inflicted emotional distress; and caused the loss of consortium.[2] The Kohs also claimed that Northbrook's policies caused the constitutional violations, *Monell v. Department of Soc. Servs.*, 436 U.S. 658 (1978); and the municipal

---

[1] References to the summary-judgment opinion are abbreviated "A." References to the record below are abbreviated "R." followed by the document number.

[2] The claims for IIED and Mr. Koh's loss of consortium were dismissed, R.82, but were repleaded to preserve issues for appeal. R.133.

defendants were liable under *respondeat superior* and indemnification theories. R.133.

Kim and Wheeling successfully moved to dismiss Mrs. Koh's claims against them, except her claim for loss of consortium, R.141, 150.

All defendants moved for summary judgment. R.274, 278. On March 29, 2018, the district court granted summary judgment for defendants on Mr. Koh's claims that: he was illegally detained before trial in violation of the Fourth Amendment; his interrogation violated substantive due process; the defendants fabricated evidence in violation of due process; and he was maliciously prosecuted. A.1–63. These claims are not at issue here as no final judgment exists. The court denied summary judgment on all remaining claims, concluding that fact disputes required a trial on: the Kohs' Fourth Amendment false-arrest claims (except against Kim); Mr. Koh's Fifth Amendment coerced-confession claim; the Kohs' conspiracy and failure-to-intervene claims; their *Monell* claims; Mrs. Koh's loss-of-consortium claim; and the *respondeat superior* and indemnification theories. *Id.*

On April 16, 2018, Graf and Ustich filed a notice of appeal. R.384 (No. 18-1809). Kim and Wheeling filed one the next day. R.390 (No. 18-1821). Both were filed within 30 days of the summary-judgment order. FED. R. APP. P. 4(a)(1)(A). Both state that Appellants appeal *only* the decision on Mr. Koh's Fifth Amendment

claim.[3] All other claims on which summary judgment was denied remain pending for trial in the district court.

The Kohs moved to certify these appeals as frivolous and proceed to trial, *Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989). R.395. Though the district court was "confident that the factual record in this case demonstrates—when viewed in Mr. Koh's favor and drawing reasonable inferences in his favor—that qualified immunity does not apply to the coerced-confession claim," it denied the motion. R.403.

On April 18, 2018, this Court stayed appeal 18-1821 and ordered briefing on whether Wheeling should be dismissed for lack of jurisdiction. No. 18-1821, Doc. 4. After briefing, Docs. 9, 12, this Court dismissed Wheeling, Doc. 18.

On jurisdiction, Appellants invoking 28 U.S.C. §1291 and the collateral-order doctrine. They assert their appeal of the summary-judgment order denying immunity can be heard immediately. Ustich 3, Kim 2–3. But as explained in Argument §§II and IV, *infra*, this Court lacks jurisdiction to consider Appellants' arguments.

## ISSUES PRESENTED

1.     Whether this Court lacks appellate jurisdiction to consider Appellants' fact-based challenges to the district court's conclusion that evidence in the record is sufficient to require a trial on Koh's Fifth Amendment claims and that material disputes of fact preclude qualified immunity at the summary-judgment stage.

---

[3] This Court should dismiss Mrs. Koh from this appeal, as the only claim appealed is Mr. Koh's. This brief sometimes refers to Mr. Koh as "Koh."

2.     If this Court exercises jurisdiction, then accepting Koh's facts and drawing inferences in his favor, whether the district court correctly denied qualified immunity because Appellants violated Koh's clearly established Fifth Amendment rights by extracting his confession using myriad techniques long held to be impermissibly coercive.

## STATEMENT OF THE CASE

On April 16, 2009, the Kohs' son, Paul, committed suicide. In the wake of that tragedy, the defendants perpetrated another: They immediately and unlawfully arrested the Kohs for murder, without any reason to think Paul had been murdered, let alone by his parents. They aggressively interrogated Koh until they coerced him into falsely confessing to a murder that never happened. Based solely on his coerced statements, Koh was held, charged, and tried. The jury swiftly acquitted, but Koh lost nearly four years sitting in Cook County jail awaiting trial.

The Kohs sued, claiming the defendants falsely arrested the Kohs, fabricated evidence, coerced incriminating statements from Koh, and caused Koh to be illegally detained and prosecuted. R.133. At summary judgment, the district court conducted an exhaustive review of the massive record and issued a detailed, 63-page opinion. A.1–63. Regarding Koh's coerced-confession claim, the court decided the record was sufficient and material fact disputes precluded Appellants' claim of immunity. *Id*. Appellants appeal that fact-based decision.

As required in this posture, the following facts are taken from the district court's assessment of the record, *Strand v. Minchuk*, --- F.3d ---, 2018 WL 6432960,

at *1 (7th Cir. Dec. 6, 2018), and the Kohs' facts, with inferences drawn in their favor, *Stinson v. Gauger*, 868 F.3d 516, 522–28 (7th Cir. 2015) (*en banc*).[4]

## I. THE KOHS

The Kohs are first-generation Korean-Americans. They moved to the United States, worked hard, established businesses, and settled in Northbrook, Illinois, where they sent their children to school and surrounded themselves with family, friends, and a vibrant church community. R.316 at 2. Unfortunately, their son Paul suffered mental-health problems, including suicidal ideation and symptoms of schizophrenia. A.55.

## II. PAUL'S SUICIDE

Around 3:45 a.m. on April 16, 2009, the Kohs awoke to a parent's worst nightmare. Paul had committed suicide and lay bleeding in the foyer of their home. A.2–3. Mrs. Koh discovered him. *Id.* She screamed, waking up Mr. Koh, who frantically called 911 (twice). A.2–3. Thinking Paul was alive, the Kohs prepared to rush him to the hospital, but first responders arrived. A.3.

Paul's death was a suicide and there was no reason to think otherwise. R.315 ¶¶1, 17–18, 53. First responders radioed that it "looks like a suicide." *Id.* ¶17. Blood-stain patterns, the lack of evidence of struggle, the absence of injuries on the Kohs, the fact that any assailant would have been drenched in blood requiring

---

[4] This factual account is found in the district court's opinion, A.1–63, the Kohs' summary-judgment brief, R.316, their Local Rule 56.1 statements, R.309, 311, 315, and Exhibits 1–189 to those statements, R.276, 280–293, 302, 308–309, 328–329. The three videos of Koh's interrogation are referenced as "V1," "V2," and "V3." R.285-1, 286-14, 286-16, 408.

extensive clean up, the lack of blood trails or transfer around Paul's body, and other physical evidence showed that Paul had killed himself and had not been assaulted by his parents. *Id.* ¶¶18, 53. The defendants learned Paul had been hearing voices, battling depression, abusing substances, and saying he wanted to die. A.7, 9, 55; R.315 ¶¶1, 25, 66.

## III.  DEFENDANTS ARREST THE KOHS

### A.    The Kohs Are Immediately Arrested at Home

Police arrived and found Mrs. Koh hugging Paul's body and sobbing. Mr. Koh was beside himself, screaming "someone help my son!" A.3; R.311 ¶¶3–4. He was in shock and thought emergency responders were preparing to rush Paul to the hospital; wanting to be there, Koh walked toward his car. R.315 ¶4; R.311 ¶¶7–8.

Police stopped him and pushed him to the ground. A.3; R.311 ¶11. They yelled at Mrs. Koh to get out of the house and pushed her down too. R.311 ¶8. Police stood over the Kohs outside for fifteen minutes, telling them to shut up and not move. A.3–4; R.311 ¶¶11, 16.

Not accepting that Paul was dead, the Kohs begged to be taken to the hospital and Mr. Koh asked if he could talk to Paul. A.3–4; R.315 ¶4; R.311 ¶13. Instead, the defendants shoved the Kohs into a squad car and drove them to the police station. A.4.

### B.    Defendants Concede They Lacked Probable Cause

In the district court, the defendants conceded they lacked probable cause to arrest the Kohs at home. R.279 at 5–16. The defendants argued only that probable

cause existed after their interrogation of Koh was complete and they had obtained incriminating statements. R.279 at 12, 15.

### C.    The Kohs Are Held *Incommunicado*

At around 4:00 a.m., the Kohs arrived at the station. A.25. After five minutes, police separated them isolated them in non-public areas. *Id*. In the 3½ hours before Koh's interrogation, the defendants refused to let him: see the station chaplain; make a phone call; see his pastor, who arrived at 6 a.m.; see relatives or church friends, who arrived by 7 a.m.; or see a Northbrook social worker who had arrived to assist. R.315 ¶¶7, 10–13, 24. The defendants did not let Koh call his lawyer. Statement of Case ("SOC") §IV.C, *infra*. This isolation continued throughout the multiple rounds of interrogation. A.36–37.

## IV.   APPELLANTS INTERROGATE MR. KOH

### A.    Koh's Mental and Physical Vulnerabilities

Koh was in an extremely vulnerable mental and physical state when Appellants—Ustich, Graf, and Kim—interrogated him. He had been held in extended isolation (he was in custody for more than nine hours by the time the interrogation concluded). A.36; R.315 ¶¶40–41. Further, he was traumatized and in severe shock from losing his son and seeing him gravely wounded. *Id.* ¶30 ("[T]rauma wreaks havoc with brain functioning."); *id.* ¶31 (police training provides that traumatized subjects are prone to give unreliable statements); *id.* ¶29 (Koh appeared cold throughout the interrogation); *id.* ¶4.

Additionally, Koh had not eaten since the day before, had hardly slept overnight, and did not sleep at the station. A.36; R.315 ¶29. He suffered from

diabetes, high blood pressure, and hyperammonemia, for which he took medications. A.36; R.311 ¶15. He asked the defendants at the scene to let him get his medications, but they refused. A.3, 22; R.311 ¶15. At the station, he told Graf of his conditions and needed medications; Graf responded that the medications would be brought to the station, but Koh was not given them at the station and not given them until after multiple rounds of interrogation led to involuntary incriminating statements. A.8, 36; R.315 ¶¶20, 29. The lack of medications caused confusion, fatigue, and shakiness. A.47. This all left Koh in an extremely diminished mental and physical state, R.315 ¶¶29–30, which Appellants exploited. Argument §III.B, *infra.*

### B.    The Language Barrier

The above factors alone rendered Koh highly susceptible to coercive interrogation. But there was also an extreme language barrier. Koh is a native Korean speaker, with limited ability to speak, understand, or read English. A.6, 38 ("The language barrier was obvious."); R.315 ¶14 (Koh's 911 calls were made in "broken English"); *Id.* ¶125; R.308-77 (expert opinions on Koh's English abilities); R.286-17 (deposition required a translator). Put simply, Koh was interrogated in a foreign language and could not understand what his interrogators were saying or the import of his responses.

A translator was obviously needed. R.315 ¶¶14–16. Northbrook staffers recommended Language Line, a service that provides trained interpreters, but the defendants demanded a police officer instead. R.315 ¶¶16, 95–97. They called officer Kim, who speaks Korean. A.6.

8

Appellants saw that Koh could not communicate in English. A.37–38, 46. R.315 ¶85. Dozens of examples from the interrogation show he did not understand what was going on. *E.g.*, A.37 (asked what type of person Paul was, he narrates what happened the morning before); *id.* (asked whether he saw a weapon, he discusses tools he kept for his business); *id.* (answers "yeah" when asked rhetorically whether God would want him to lie); V2 at 1:20–1:50 (R.285-3 at 59) (accused of lying, he nods amicably, showing he does not know what is being said); R.285-3 at 61, V2 at 3:44–3:50 (Graf: "I'm having a hard time understanding what you're saying"); R. 285-3 at 103, V2 at 44:18–44:45 ("Q. You don't want that? A. No. A little more clear understand this. I don't mind you want to stay, come in early and then he's stay awake when there's bad things to do."); R.285-3 at 103, V2 at 44:46–45:23 (answers "no" to a question, then after translation changes to "oh yeah, definitely"; says "I need this interpreter," to which Graf responds "I know" and "I don't know if you can understand me"); V2 at 46:37–47:34 (R.285-3 at 104–05) (Graf treats Koh like a child, using cups to represent Paul's friends; Koh still needs interpretation); R.285-3 at 105, V2 at 47:47–48:18 (changes answer from "no" to "oh yeah, definitely" after translation).

Koh's limited English abilities made him more susceptible to coercion. R.315 ¶84 (forensic psychiatrist Dr. Galatzer-Levy explaining how the language barrier affected Koh's psychological state). In fact, Koh's inability to communicate undermined his ability to participate in the interrogation at all. *Id.* ¶125 (barrier prevented Koh from reporting past events accurately, made interactions difficult

where he did not control the subject or where topics shifted, and rendered him unable to communicate when linguistic demands were complex). Not only did the language barrier naturally exacerbate Koh's other mental and physical deficits, Appellants exploited the barrier to extract incriminating statements they knew Koh did not understand. Argument §III.B, *infra*.

### C.     Koh Is Not Allowed to Contact His Attorney

In spite of an Illinois law requiring homicide interviews to be videotaped, Graf spoke to Koh before recording started. R.315 ¶¶20–21; R.311 ¶48. Graf asked if Koh had a lawyer, to which Koh responded, "Yes, yes, I do." R.315 ¶21. Koh did not know his lawyer's phone number and asked to speak to his pastor, daughter, or church friend, but Graf responded that Koh could only speak to his lawyer, so Koh was not allowed to call his lawyer. *Id*.; R. 298-1 at 5 (Pretrial Hearing Tr. at 15:17–16:1).

### D.     Appellants Do Not Give Koh *Miranda* Warnings

Appellants did not give Koh complete and accurate *Miranda* warnings, actively undermined the partial warnings they did give, and directed Koh to sign a *Miranda* waiver he could not read. At the beginning of the interrogation, Graf told Koh that Kim was there to translate. A.7–8. Graf then said he was going to read Koh his *Miranda* rights, and he asked Koh whether knew what those rights were. Koh indicated he did not. R.315 ¶99. When Graf started to read in English, Koh asked Kim to "transfer." *Id*. ¶¶100–101; V1 at 1:30–1:36; R.285-3 at 2; R.284-14 at 243–44 (Graf acknowledging Koh did not understand and "looked to [Kim] for interpretation").

Kim did not translate Graf's *Miranda* warnings or their substance. A.38; R.315 ¶¶102–105. Specifically, Kim did not tell Koh that his statements could be used against him, or that he had a right to an attorney even if he could not afford one. *Id.* ¶104. Instead, Kim said Koh could bring in his own attorney, and then raised the issue of cost, leading Koh to ask if it would be okay to proceed without one. *Id.* ¶105. Kim advised that Koh did *not* need an attorney and directed Koh to sign and date the English *Miranda* waiver. *Id.* ¶105. Koh did not understand and began to write the time that his wife discovered Paul's body—Appellants stopped him and told him to write "7:32 a.m." instead. V1 at 2:10–2:36. Appellants provided no other *Miranda* warnings.

### E.     Koh Truthfully Denies That He Killed His Son

In the interrogation, Koh detailed the events of the prior day and stated unequivocally and repeatedly that he had nothing to do with Paul's death. A.9; R.315 ¶109; V1 at 19:42–24:30, 34:21–34:42, 36:33–37:55. His wife independently corroborated that account when police interrogated her at the same time. A.9–11; R.315 ¶111.

### F.     Koh Is Held In Isolation Again

After an hour of questioning, Appellants took a three-hour break. R.315 ¶22. They again isolated Koh in an interview room, not allowing him to call anyone or see the friends and relatives who had arrived, including his daughter Helen. *Id.* ¶¶23–25, 114. Koh overheard police saying they thought he had killed Paul. *Id.* ¶22. Off-camera, Kim pressured Koh to confess and told an incredible lie: he said that Koh's wife had reported that Koh murdered their son. R.309 ¶44.

11

### G.     Appellants Decide to Extract a Confession

Without evidence, Appellants set out to extract a confession from Koh. They ignored the evidence of suicide, SOC §II, *supra*; they ignored that Koh's wife corroborated his statements, and they treated the two Kohs differently despite their similar accounts, A.10–11; R.315 ¶111, 113[5]; they openly discussed their view that Koh was guilty before he had made a single incriminating statement, R.315 ¶¶22, 25; and they repeatedly accused Koh of committing the crime despite his denials, A.41; R.315 ¶¶36, 109; R.311 ¶93.[6]

Before reinitiating questioning, Graf made clear that he intended to grill Koh until he confessed, no matter how long that took: he asked staff to buy "at least a half dozen" videotapes of the "longest minute count possible." R.315 ¶27. Appellants interrogated Koh not to learn the truth but to obtain evidence incriminating him.

---

[5] It is difficult to explain why Appellants were dissatisfied with Koh's account but accepted his wife's, particularly since she was holding Paul in her arms, covered in blood, when police arrived. A supported but unsavory scenario is that they relied on negative stereotypes about East Asian men. A.46 (Graf made comments about Koh's race, asking whether he was Korean, Filipino, or Chinese); R.315 ¶25 (Koh's family members were asked whether it was customary for Koreans to physically punish children); *id.* ¶75 (one defendant believed Koh killed his son because of "the culture of the Korean community"); *id.* ¶76 (defendants called Koh "Hop Sing" in emails, referencing the Asian male caricature from American television in the 50s, 60s, and 70s).

[6] Appellants emphasize their use of an interrogation technique known as the Reid Technique. But they *misused* that technique. It is widely understood, and Appellants knew, that the technique should be used only to obtain confessions from suspects known to be guilty. It should never be used to determine whether a suspect is guilty or innocent, and it is expressly not to be used with an innocent subject because it is so psychologically coercive. Appellants used the technique even though they knew or suspected that Koh was innocent and never had a good reason to think otherwise. R.315 ¶¶28, 95, 98; R.311 ¶¶50–51, 65, 94–95.

### H.     Appellants Use Coercive Tactics

At 11:30 a.m., Appellants began an aggressive and coercive interrogation, using several impermissible tactics. A.11–14, 34–48.

At the outset, Koh repeated his truthful account: that he woke up to his wife's screams around 3:45 a.m. and he did not kill Paul. A.11; V2 at 30:20–39:08. But Appellants refused to accept his denials. A40–42. Graf repeatedly accused Koh of lying. *Id.*; R.315 ¶¶36, 109; R.311 ¶93; V2 at 38:14–39:08. Graf even exploited Koh's devout religious beliefs, saying that Koh was lying and implying that God would judge him for it. A.37, 41.

Appellants used psychological and physical intimidation and implied threats of violence. As Koh's denials continued, Graf intensified his questioning. A.11, 40–42. Appellants raised their voices and yelled. A.12; V2 at 53:05–53:53, 58:25–1:00:11; V3 at 3:33–3:48, 4:30–5:05, 16:45–17:08; R.311 ¶92. Graf got within inches of Koh's face as the questioning intensified. A.11; V2 at 45:10–45:25; V3 at 0:27–0:40; R.315 ¶33. Graf repeatedly touched Koh in an unwarranted and unwanted manner. A.12; V2 at 59:27–1:00:11, 1:02:24–1:02:52, 1:04:07–1:04:19, 1:09:14–1:09:20, 1:09:45–1:09:52; R.315 ¶33. He clapped at Koh and swung his hands in Koh's face. V3 at 18:48–18:56, 19:00–19:10; R.315 ¶33. Kim kept his gun visible. A.41; R.311 ¶97. The district court concluded that a jury could view this behavior as an implied threat of physical violence. A.46.

In addition, Appellants fed Koh all of the facts of the supposed crime that they wanted him to adopt. A.12–13. Graf asserted that: Paul went out late at night; Koh awoke in the middle of the night, noticed Paul missing, and got angry; Paul

13

came home and responded to Koh's anger by attacking Koh; and Koh then grabbed a knife and slashed Paul's neck in self-defense. Graf repeated the story *ad nauseam*. A.40; R.315 ¶¶38, 45–50. Kim made chopping and slicing gestures at Koh, while Graf explained how Koh stabbed Paul. R.315 ¶¶50, 122. Graf did the majority of the talking, violating established standards that require interrogators to listen to a subject's statements rather than supplying facts that might pollute a confession. *Id.* ¶35. Appellants fed this factual account to Koh knowing it did not match the evidence gathered at the scene. *Id.* ¶51–52. As the district court found, Appellants provided Koh with every incriminating fact he adopted. A.45.

Graf heightened the pressure to confess by threatening to continue the interview until Koh adopted Appellants' story. Appellants refused to accept Koh's denials, accusing him of lying when he said he was innocent, and ramping up their psychologically and physically coercive tactics. At the same time, Graf told Koh that the interrogation would continue "for days and days and days" if Koh did not tell "the truth." A.45–46; R.315 ¶37. As the district court put it, given Graf's refusal to accept Koh's avowals to that point, "Koh would have understood 'the truth' to mean 'what Graf wanted to hear.'" A.46. Appellants communicated that the only way for Koh to end the interview was to confess.[7]

Moreover, Appellants falsely told Koh they had other evidence implicating him in the murder, even though the evidence showed there was no murder. A.7, 9,

---

[7] This pressure to confess was heightened by the untenable choice Appellants presented: Koh could either adopt their false story, which at least minimized guilt by suggesting self-defense, or he would be investigated for murdering Paul in a violent rage. A.45; R.311 ¶ 95; V3 at 11:53–12:34.

40–41, 55; R.315 ¶¶1, 17–18, 25, 53, 66. Both Graf and Kim informed Koh that his wife had implicated him, but she had not. A.40–41; R.309 ¶44; V3 at 3:20–3:43. Graf also falsely implied that physical evidence and witness interviews implicated Koh. A.40–41. The district court concluded that a reasonable jury could find that Appellants crossed the line from being permissibly misleading to outright coercing an involuntary confession by, among other means, badgering, pressuring, lying to, and manipulating Koh. A.42 & n.34.

## I.     Appellants Exploit the Language Barrier

As discussed in SOC §IV.B, *supra*, Appellants knew Koh did not speak or understand English. Nonetheless, Graf baselessly accused Koh of lying about his inability to understand English. A.38 & n.32. Kim was present but provided little translation and even asked his own questions in English. A.9, 12, 38–39.

Throughout, Graf questioned Koh in English. A.9. He did not leave time between questions for Koh to understand the question or for Kim to translate. A.12; R.315 ¶36. He abruptly switched topics, causing even greater confusion. A.38; A.46–47 & n.37 (at a key moment, Graf understood Koh to be admitting to killing Paul in self-defense when Koh was talking about an entirely different interaction with Paul); R.315 ¶39. Based on these facts, the district court decided that "[a] reasonable jury could conclude that Graf *knew* that he was pressuring Mr. Koh to agree with statements that he did not fully understand." A.46.

But Appellants went well beyond interrogating Koh in a language he could not understand. In addition, Kim actively mistranslated the questions. A.38–39. Beyond the above-described issues surrounding the *Miranda* warnings, Kim

15

mistranslated Koh's use of the Korean idiom "*gachi jookja*" (roughly equivalent to the English phrase "you're killing me"), which Koh had used during a past interaction with Paul. A.38–39; R.315 ¶¶115–118. Rather than providing the idiom's common meaning, Kim provided a literal translation—"let's die together"—without mentioning that it was an idiom not to be taken literally. *Id.* Appellants considered Koh's use of the phrase an important indication of guilt. R.315 ¶117. Kim's misleading translation was not due to a mere lack of time during the interrogation: he put the same misinformation in the official report he filed afterward. A.50.

Kim's mistranslation extended to other questions and answers. R.39–40. And Kim asked his own questions in Korean that Graf had not asked. *Id.* At a moment when Graf attempted to get Koh to admit to killing Paul in self-defense, Graf asked repeatedly whether Paul had attacked Koh with a knife. R.315 ¶¶119–120. At the same time, Kim interjected his own question in Korean, which had nothing to do with Koh killing Paul. When Koh responded with a single affirmative answer, Kim proclaimed suddenly that Koh had admitted to killing Paul in self-defense, even though he had not. R.315 ¶119; V3 at 12:30–12:35; R.308-73 at 5–6. Again Appellants considered this an important admission. R.315 ¶120.

## J. Appellants Exploit Koh's Mental and Physical Vulnerabilities

Appellants also exploited Koh's obvious mental and physical vulnerabilities. Throughout the interrogation, Koh exhibited signs of distress. A.37. He was exhausted and freezing. A.37; V2 at 2:00–2:09, V3 at 0:25–0:40. He repeatedly hit himself on the head and chest. A.12, 37; R.315 ¶32; V2 at 44:01; V3 at 10:49–10:52.

He hunched over and stared blankly. A.12, 37; R.315 ¶32; V3 at 3:15–4:00, 18:04–18:24. He told Appellants he was having problems with his memory. R.315 ¶32. When Koh's attorney was allowed in the room (after a long delay discussed in the next section), he found Koh disoriented, disheveled, and exhausted. A.37 & n.30.

Appellants knew Koh had been held in extended isolation. SOC §§III.C, IV, *supra*. They knew he was traumatized and in shock. SOC §IV.A, *supra*. They knew he had not slept or eaten. *Id.* And they knew he had not taken essential medications for his serious conditions. *Id.* In other words, they knew that Koh was in no position to be interrogated, and they knew they had exploited him. Indeed, on the way to court the next day, Graf told Koh not to mention any of this, saying, "If you say in the presence of the judge that you are either sick or dizzy, then we will take a week or even two to [] investigate you, so don't do that." A.47; R.283-6 at 425:13–17.

Viewing the record in the Kohs' favor, the district court decided that Appellants were well aware of Koh's physical and psychological vulnerabilities and intentionally exploited them with aggressive tactics. A.46–47. The court concluded that "these facts and circumstances show that Detective Graf was intent on coercing a confession out of Mr. Koh." A.48.

### K.     Appellants Bar Koh's Attorney from the Room

Finally, Appellants barred Koh's attorney from seeing him while they rushed to secure incriminating statements. Though Graf had not allowed Koh to call his attorney, and Kim had advised him to proceed without one, SOC §§IV.C–D, *supra*, Koh's family and friends decided during the interrogation to call Koh's lawyer, Michael Shim. A.13 & n.13; R.315 ¶¶25, 40–43. Shim immediately called the

17

station, said he was Koh's attorney, and said he was on his way. A.13 & n.13; R.315 ¶40. When he arrived, Shim said he was Koh's lawyer and he wanted to see Koh, but he was made to wait twenty minutes while the interrogation continued. A.13 & n.13; R.315 ¶41. Approximately three minutes before the interrogation ended, Graf's Commander summoned Graf out of the room. A.13; V3 at 18:08–18:45. Graf reported that, in his view, Koh was confessing. A.13; R.315 ¶42. The Commander told Graf that they had to let Koh's attorney into the room. *Id.*

Frustrated, Graf returned and picked up the pace of the interrogation, yelling at Koh, "Hyung Seok, come on. Right now, let's be done, hurry up, fast!" A.13; R.315 ¶¶42–43. Graf ramped up the coercive tactics. A.42. Two minutes later—more than a half hour after he had arrived—Shim reached the room and immediately terminated the interrogation. A14; R.315 ¶43.

### L.    His Will Overborne, Koh Makes Incriminating Statements

Before Shim could terminate the interview, Koh made incriminating statements. A.13–14 & n.14. Koh agreed to Appellants' story that he woke up in the middle of the night, discovered Paul gone, became angry, had an altercation with Paul when he arrived home, grabbed a knife, and cut Paul's throat. A.12–13, 40–42, 45; R.315 ¶¶45–50. Evaluating the entire record, the district court (and three experts) concluded that Koh's false incriminating statements—all of which originated with Appellants—were the product of coercion and an overborne will. A.34–48; R.315 ¶82 (former FBI supervisory special agent McCrary); *id.* ¶83 (social psychologist and confessions expert Dr. Ofshe); *id.* ¶84 (forensic psychiatrist Dr. Galatzer-Levy).

## V.    KOH'S CRIMINAL PROCEEDINGS

Based on Appellants' oral and written accounts of Koh's confession, and watching a few minutes of the video, prosecutors approved murder charges. A.14–15; R.315 ¶¶54, 59–65. R.315 ¶54, 66. At Koh's *Gerstein* hearing the next day, relying on a conversation with Graf, the prosecutor told the judge that Koh had received *Miranda* warnings, said his son was killed by intruders, and then later confessed. R.315 ¶¶71–72. Koh was held on a $5 million bond. About a month later, after hearing only Graf's testimony that Koh had confessed, a grand jury indicted Koh for murder.

Koh spent almost four years in jail. R.315 ¶74. The time was particularly difficult given his language barrier and lack of sophistication about living among detainees—and his inability to bury Paul and properly mourn. R.316 at 22.

Koh was represented at trial *pro bono* by Jenner & Block. R.315 ¶74. His videotaped statements were introduced against him, and Graf and Kim testified against him. R.316 at 22. After a three-week trial, Koh was acquitted. *Id.* The jury deliberated for two hours, including lunch. *Id.*

## VI.    THE DISTRICT COURT'S DECISION

The district court performed an exhaustive review of the record and issued an extraordinarily detailed opinion, granting summary judgment on some claims and denying it on others. A.1–63; Jurisdictional Statement, *supra*. The court devoted 30 pages to explaining the material disputes of fact that precluded qualified immunity on Koh's Fifth Amendment claim at the summary-judgment stage. A.2–16, 34–48. After reviewing all of the evidence of Koh's vulnerabilities and Appellants' tactics,

and examining those factors in light of long-established law, the court wrote in summation:

> A reasonable officer would have known that verbally and physically intimidating a suspect, as well as manipulating him, lying to him, and coaching him on the details of the confession, all while knowing he was not fluent in English and was operating without food, medications, or sleep, violates the Fifth Amendment. And a reasonable officer assigned to interpret for that suspect would have recognized that manipulating his deficient understanding of English, mistranslating the Miranda warnings, and altogether refusing to provide translation assistance, likewise violates the Constitution.

A.44–45.

## SUMMARY OF THE ARGUMENT

After his son Paul committed suicide, Koh was arrested, charged with murder, and held in jail for four years, before being acquitted by a jury. His prosecution and detention were based on involuntary incriminating statements that Appellants coerced from him during a plainly illegal interrogation. After reviewing an immense pretrial record, the district court determined that numerous genuine disputes of material fact exist, so qualified immunity cannot defeat Koh's Fifth Amendment claim at the summary-judgment stage. The district court carefully applied longstanding Supreme Court and circuit precedents in deciding that the facts, construed in Koh's favor, showed a violation of Koh's clearly established rights. The district court also allowed certain other of the Kohs' claims to proceed to trial, but granted summary judgment to the defendants on some claims.

Appellants appeal the summary-judgment order, but only as it concerned Koh's Fifth Amendment claim. They contend this Court has jurisdiction by virtue of

the collateral-order doctrine. But that doctrine does not apply to the arguments Appellants actually raise. Instead of presenting purely legal issues based on the Kohs' facts, Appellants strongly contest nearly all of those facts, challenge the district court's conclusion that the record is sufficient to require a trial, ask this Court resolve fact disputes in their favor, ignore facts essential to the summary-judgment decision, and present legal arguments that necessarily depend on their own self-serving factual account. The Supreme Court and this Court have stressed repeatedly that such factual challenges are impermissible in qualified-immunity appeals, and this Court has dismissed several recent appeals raising similar arguments for lack of jurisdiction. This Court should do the same here.

If this Court determines there is a basis to exercise jurisdiction, the district court's order should be affirmed. Accepting Koh's facts and drawing inferences in his favor, Appellants plainly violated long-established Fifth Amendment law. Appellants were plainly aware that Koh suffered pronounced mental and physical deficits, including an inability to speak the language of the interrogation and a denial of essential medications. In addition, through the use of myriad specific tactics, long held to be impermissibly coercive, Appellants overbore Koh's will and coerced his false confession. Those tactics include exploiting Koh's mental and physical impairments caused by his inability to comprehend English and his lack of sleep, needed medications, and food; failing to advise him of his *Miranda* rights, giving him false information about those rights, and questioning him after he invokes his right to counsel; keeping him in extended isolation; feeding him facts of

the crime they made up; categorically rejecting any answer unless it is incriminating; and implicitly threatening him with physical violence.

Last, Appellants suggest that a state judge's decision not to suppress the coerced confession supersedes to break the chain of causation between their wrongful acts and the harm suffered. But this Court lacks jurisdiction to consider that fact-based legal question, which is wholly unrelated to immunity. And this Court has repeatedly rejected precisely this argument on the merits.

## ARGUMENT

## I.    STANDARDS OF REVIEW

This Court examines jurisdiction *de novo*. *Muratoski v. Holder*, 622 F.3d 824, 829 (7th Cir. 2010). Because the appeals purport to invoke the collateral-order doctrine, they necessarily must raise purely legal issues, *Johnson v. Jones*, 515 U.S. 304, 313 (1995), which this Court reviews *de novo*, *Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018). Any facts must come from the district court's assessment of the record or the Kohs' version of the facts, drawing inferences in their favor. *Stinson*, 868 F.3d at 522–28.

## II.    THIS COURT SHOULD DISMISS FOR LACK OF JURISDICTION

Appellants contend this Court has jurisdiction under 28 U.S.C. §1291 because denials of immunity can be appealed under the collateral-order doctrine. Ustich 3; Kim 2–3. But this exception to the final judgment rule is not so broad, and Appellants' arguments on appeal do not fit within it.

"Review of such an interlocutory decision is proper if, and only if, the defendant presents a purely legal question for this court to review." *Hurt*, 880 F.3d

at 839; *Strand*, 2018 WL 6432960, at *2. Here, Appellants contest the facts and make arguments that require resolution of factual disputes, rather than presenting purely legal arguments. This Court decided in three recent cases that it lacked jurisdiction over precisely the types of arguments Appellants make. *Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018); *Hurt*, 880 F.3d 831; *Stinson*, 868 F.3d 516. This Court should dismiss for lack of jurisdiction.

## A.    Jurisdictional Limits in Qualified-Immunity Appeals

The collateral-order doctrine is an exception to the final judgment rule, permitting appeals of non-final orders that: (1) conclusively determine a disputed question; (2) resolve an issue separate from the merits; and (3) are effectively unreviewable at final judgment. *Cohen v. Beneficial Loan Corp.*, 337 U.S. 542, 546 (1949); *Digital Equipment Corp. v. Desktop Direct*, 511 U.S. 863, 867–68 (1994).

In *Mitchell v. Forsyth*, the Supreme Court extended this doctrine to denials of immunity at summary judgment. 472 U.S. 511, 525–30 (1985). Such denials can sometimes be appealed, but "the *Cohen* framework breaks down if there is no separation between the merits of the underlying lawsuit and the subject matter of the collateral order being appealed." *Jones v. Clark*, 630 F.3d 677, 679 (2011). "The problem, as the [Supreme] Court has recognized, is that a great number of orders denying qualified immunity at the pretrial stage are linked closely to the merits of the plaintiff's claim." *Id*.

In response to this problem, *Johnson*, drew a strict line: jurisdiction in qualified-immunity appeals is limited to "abstract issues of law." 515 U.S. at 317;

see also *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). Other arguments are outside of appellate jurisdiction and are off-limits, including:

- attacks on the district court's conclusion that the evidence is sufficient to require a trial, *Behrens*, 516 U.S. at 313; ;

- challenges to the district court's decision that fact disputes preclude judgment, *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011); *Johnson*, 515 U.S. at 319–20;

- requests that an appellate court resolve fact disputes, adopt a new version of the facts, re-weigh the evidence, or draw different inferences, *Tolan v. Cotton*, 572 U.S. 650, 659–60 (2014); , at *Stinson*, 868 F.3d at 525–28; and

- arguments that the evidence does not support a particular factual finding or inference, *id.* at 525–28.

These jurisdictional limits also apply when purportedly legal arguments stray into factual territory. *Ashcroft v. Iqbal* held that "'fact-related' legal inquiry" is outside of appellate jurisdiction, 556 U.S. 662, 674 (2009), and this Court has made clear that "an appellant challenging a district court's denial of qualified immunity effectively pleads himself out of court by interposing disputed factual issues in his argument," *Gutierrez v. Kermon*, 722 F.3d 1003, 1010 (7th Cir. 2013). The same is true when a legal argument is premised on a contrarian view of the facts. *Stinson*, 868 F.3d at 525–26. This Court has warned that if it detects such a "back-door effort to contest the facts, [it] will reject it and dismiss the appeal for want of jurisdiction. *Jones*, 630 F.3d at 680.

## B.     Stipulating to Facts to Secure Jurisdiction

Often appellants attempt to secure jurisdiction by asserting they accept the plaintiff's facts. *Jones*, 630 F.3d at 680. But this Court cannot exercise jurisdiction if

that assertion is false, meaning the appellant actually challenges the plaintiff's facts (explicitly, or implicitly by presenting arguments at odds with those facts). *Stinson*, 868 F.3d at 525.

Whether jurisdiction is proper is based on the positions actually taken in appellants' briefs—the Court does not endeavor, on its own, to construe the record in the plaintiff's favor and find purely legal arguments that could be made. *Stinson* stressed this point, dismissing appeals despite the appellants' contention that they accepted the plaintiff's facts, because their briefs omitted or failed to credit material facts, asserted there was insufficient evidence, and argued that circumstantial evidence did not warrant particular inferences. 868 F.3d at 525–28.

This Court has repeatedly enforced this jurisdictional limit. *Jackson*, 888 F.3d at 263–64 (dismissing because videotaped interrogation necessarily open to interpretation); *Hurt*, 880 F.3d at 839–40 (no jurisdiction over challenges to conclusions and inferences drawn from videotaped interrogation); *Whitlock v. Brueggermann*, 682 F.3d 567, 573–75 (7th Cir. 2012) (no jurisdiction to review genuine dispute of fact); *Hill v. Coppelson*, 627 F.3d 601 (7th Cir. 2010) (dismissing where resolution of legal issues required revisiting facts); *Levan v. George*, 604 F.3d 366 (7th Cir. 2010) (dismissing where it was "nearly impossible to sever [factual and legal] questions"); *White v. Gerardot*, 509 F.3d 829 (7th Cir. 2007) (dismissing where arguments depended on disputed facts).

## C.    Appellants Present Factual Challenges, Not Legal Issues

Examining Appellants' briefs, it is apparent that this Court lacks jurisdiction. Absent from Graf and Ustich's brief is any statement that they accept Koh's facts.

They do not acknowledge—let alone attempt to satisfy—this jurisdictional requirement. Meanwhile, Kim pays lip service to the rule that he must accept Koh's facts, Kim 6–7, but fails to do so, *id.* at 7–11. Appellants challenge the district court's factual determinations, present their own versions of facts as uncontested, attack Koh's facts, ignore disputes, and omit facts when they are bad for Appellants.

Consider their statements of the case, which contest or omit the following:

- Appellants refuse to accept that Paul's death was a suicide, describing the scene as "graphic," omitting all evidence of suicide, highlighting evidence they think suggests homicide, and saying that certain evidence "demonstrated that Paul's death was a homicide." *Compare* Ustich 4–6, 12 *with* SOC §II, *supra*.

- They did not admit they arrested the Kohs immediately or mention that they lacked probable cause to arrest, despite their concession below on the subject. *Compare* Ustich 4–6, *with* SOC §§III.A–B, *supra*.

- They suggest the Kohs were together at the station, instead of agreeing they were separated. *Compare* Ustich 5, *with* SOC §III.C, *supra*.

- They do not mention the Kohs were held *incommunicado* for hours, without a phone call or contact with family or friends. SOC §III.C, *supra*.

- Appellants exclude nearly all discussion of Koh's known vulnerabilities. They do not mention he was in shock and traumatized, SOC §IV.A, *supra*; or that he had not slept for hours, *id*. While Graf admits he knew Koh needed medications, Appellants strangely suggest Koh timely received his medications because he got them *after* the interrogation, omitting that he was without medication during the interrogation and suffered mental and physical consequences. *Compare* Ustich 7 & n.8, *with* SOC §IV.A.

- Appellants largely ignore Koh's language barrier, SOC §IV.B, *supra*, mentioning language only in an attempt to downplay the barrier, Ustich 7 (saying Koh did not "notify" them that he needed help with English); *id*. (asserting that Graf "implored" Koh to stop the interrogation if he could not understand); *id*. at 8–11 (discussing the first interview as if there was no language barrier); *id*. at 13–20 (same

for second interview); Kim 9 (admitting only that "some of [Koh's] answers were confusing or unresponsive").

- They do not mention that Koh was not allowed to call his lawyer. SOC §IV.C, *supra*. And while they mention Koh's lawyer being let into the interrogation room at the end of the interrogation, Ustich 18–19, they do not mention he was made to wait an extended period before being allowed in, during which time they extracted incriminating statements. SOC §IV.K, *supra*.

- Appellants omit that they set out to extract a confession from Koh, committing and threatening to interview him for as long as it took to get a confession, even though they knew or suspected he was innocent. SOC §IV.G, *supra*.

- In a striking contradiction of Koh's facts, Graf and Ustich contend that Koh received his *Miranda* warnings, indicated he understood them, and voluntarily signed a waiver. Ustich 7–8. Kim concedes that the parties "debate" whether proper *Miranda* warnings were given, but he asserts that Koh executed a valid waiver. Kim 9. *Compare* SOC §IV.D, *supra*.

- Instead of agreeing that Koh repeatedly denied killing Paul and provided a credible account corroborated by Mrs. Koh, SOC §IV.E, *supra*, Appellants discuss at length what they (unreasonably) regard as inconsistencies in Koh's story and reasons to suspect him of murder, Ustich 8–11.

- Appellants omit that Koh was held in isolation between the two interrogations, SOC §IV.F, *supra*, and they instead discuss contested and immaterial facts about this period of time.[8]

---

[8] Appellants now suggest they had reason to charge Koh based not on Koh's confession but on his first interrogation and a random collection of facts learned before the second interrogation. *Id.* at 11–13. This suggestion is problematic because: (1) it contradicts their concession below that there was no probable cause until after Koh's second interview, SOC §III.B, *supra*; (2) it is a self-serving account of contested facts that draws questionable inferences in Appellants' favor; (3) it concerns an issue Koh has not and cannot raise in this appeal, given that the district court's order on this subject is not yet final; and (4) it is utterly immaterial to the Fifth Amendment analysis, particularly because there is no dispute that Koh's confession—and not this information identified by Appellants—was the basis of Koh's charges, detention, and criminal prosecution, SOC §V, *supra*.

- Appellants describe the second interrogation as if it was pleasant, mentioning just three occasions on which Graf confronted Koh, Ustich 15–16, 19, and recounting that Graf raised his voice on two occasions. Ustich 15–16 nn.12&13, 19. This contradicts Koh's facts, the district court's conclusion that Appellants used psychological and physical intimidation, and its conclusion that they exploited Koh's mental and physical vulnerabilities. SOC §§IV.H, J.

- Instead of agreeing that they repeatedly lied to Koh about evidence implicating him, including their lie about his wife implicating him, Appellants suggest they merely warned Koh that if he lied they would find out, Ustich 16, ignoring the district court's conclusion that their lies crossed the line from misleading to outright coercion. SOC §IV.H.

- They judiciously avoid any discussion of how they exploited Koh's language barrier. SOC §IV.I, *supra*. Graf and Ustich do not discuss the subject at all, Ustich 8–20, and Kim provides an extremely abbreviated account of his participation in the hours-long interrogation. Kim 9–11. Kim admits he provided little help translating, *id.*, but omits that the consequence was that Koh could not understand anything, SOC §IV.I, *supra*. Kim concedes he translated *gachi jookja* as "let's die together," Kim 9, but omits that he did not mention it was an idiom and not a confession of guilt, SOC §IV.I, *supra*. In reference to a part of the interrogation where Kim mistranslated Graf and asked simultaneous questions in Korean, Kim again asserts—as he did during the interrogation—that Koh admitted to killing Paul in self-defense, Kim 9–10, even though the evidence is to the contrary, SOC §IV.I, *supra*. And Kim asserts he only made two translation errors, Kim 11, when that fact is contested as well, SOC §IV.I, *supra*.

- Appellants contend repeatedly that their use of the Reid Technique shows their actions were legal, Ustich 6, 14, 16 & n.14, 19–20, but they ignore entirely that they *misused* the Reid Technique by employing that psychologically coercive method on someone not known to be guilty. SOC §IV.H & n.7, *supra*.[9]

- Importantly, Appellants' account of the interrogation makes it appear as though Koh spontaneously confessed, providing "admissions" without prompting. Ustich 17–18. They do not even mention that they fed all of the facts to Koh, repeating them relentlessly, in the face of denials, until Koh acquiesced. SOC §§IV.H, L, *supra*. Nor do they

---

[9] Moreover, Appellants ignore that many of their tactics have nothing to do with the Reid Technique, and that the Reid Technique was immaterial to the district court, which did not mention it.

acknowledge the district court's conclusion that the statements were the result of coercion and an overborne will. *Id.*

- They omit that the coerced statements were the basis for the criminal charges, indictment, and prosecution. *Compare* Ustich 20, *with* SOC §V, *supra.*

- Appellants reiterate the findings of a Cook County judge as if they were uncontested issues here, Ustich 20–21; Kim 11, when in fact they are all contested, and the district court found them to be, SOC §§V–VI, *supra.*

This long list of disputed facts demonstrates that these appeals stray far from presenting purely legal issues over which this Court has jurisdiction.

Unsurprisingly, Appellants' factual attacks thoroughly infect their legal analysis. See Ustich 30, 32 (calling it "undisputed" there were no threats); *id.* (relying on Cook County judge's factual findings); 32 (contending they had reason to suspect Koh); *id.* (contending they misled Koh but did not impermissibly lie to him); 33 (downplaying the language barrier as "confusion" and contending they eliminated it with an interpreter); 34 (ignoring their exploitation of Koh's mental and physical vulnerabilities); 35 (contending Koh had everything he requested); 36–37 (contending Koh's sleep deprivation did not matter and that he timely received medication); 41, 44 (relying on their use of the Reid Technique); 43 (asserting they made no physical threats); Kim 16 (contending there is insufficient evidence of intent); 17, 19 (denying knowledge of the investigation); 17–20, 32, 45, 46 (minimizing Kim's role in the interrogation); 18 (arguing evidence insufficient to show conspiracy); 20 (contending *Miranda* warnings were sufficient); *id.* (contending there were just two translation errors); *id.* (contending the translation of *gachi jookja* was not deceptive); 22 (disputing that Kim's actions caused Koh to

confess); 44 (incorrectly asserting the district court analyzed only one of Kim's actions). Appellants' legal arguments cannot be separated from these disputed facts, and cannot be resolved in Appellants' favor without improperly accepting their alternate facts.

Three additional points illustrate that jurisdiction is lacking. First, Appellants suggest strongly (without arguing explicitly) that the videotape of the interrogation contradicts the district court and Koh's version of the facts. Ustich 37 ("[T]he videotaped interrogation demonstrates that Defendants did not use a single prohibited tactic."); see also *id.* 30, 33, 42, 45–46, 48–49. Appellants do not make the argument explicitly because this Court has twice rejected it recently, holding that it lacks jurisdiction to consider fact disputes about what a video shows or to draw inferences from a video contrary to the district court's decision or the plaintiff's facts. *Jackson*, 888 F.3d at 263–64 (no jurisdiction to consider whether a videotaped interrogation showed unconstitutional susceptibilities or tactics because a "video cannot conclusively resolve" that question since "video is bound to be subject to varying interpretations"); *Hurt*, 880 F.3d at 839–40 (2018)no jurisdiction "to revisit the inferences that the district court found could reasonably be drawn from [the] recorded interrogation").

Second, Appellants present "legal" arguments that isolate factors involved in the interrogation and discuss whether a single factor, on its own, violated the Constitution. Ustich 41 (focusing solely on legality of Graf's statement that the interrogation would continue for days); Kim 19–20 (focusing solely on one of Kim's

translation errors). This Court in *Jackson* stressed that it lacked jurisdiction to consider such arguments—*i.e.*, in a coerced-confession case, a challenge to the district court's conclusion that attacks one among many vulnerabilities or tactics. 888 F.3d at 265–66 ("In sum, the district court did not conclude [appellants'] comments regarding race, in a vacuum, violated a clearly established right, but rather considered the totality of the alleged circumstances. So even if in a vacuum the race comments do not violate such a right, the district court committed no error because it did not hold they did. As the district court made no conclusion here raising a pure legal issue regarding qualified immunity, we lack jurisdiction.").

Finally, Kim unambiguously contends that there is insufficient evidence to conclude that he acted with the requisite mental state. Kim 16–23. This is exactly the argument that deprived this Court of jurisdiction in *Stinson*, 868 F.3d at 526–27 ("*Johnson* itself explains that we lack jurisdiction over factual questions about whether there is sufficient evidence of intent"), and Kim's argument must meet the same fate.

### D.    This Court Should Dismiss the Appeals

Returning to first principles, Appellants' arguments do not fit the collateral-order doctrine because they are not separate from the merits; appellants ask this Court to overrule the district court's view of the record, which is prohibited. *Johnson*, 515 U.S. at 314–15 (questions like these are not "separate" because they are not "significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits"); *Iqbal*, 556 U.S. at 674 (improper to ask appellate court "to consult a vast pretrial record, with numerous conflicting

affidavits, depositions, and other discovery materials"). These appeals are a "back-door effort to contest the facts," *Jones*, 630 F.3d at 680, further delaying a case that is headed to trial in any event and will be a decade old when it concludes. The *Behrens* Court suggested trial courts should certify appeals like this as frivolous, 516 U.S. at 310., but trial courts cannot be certain before the opening briefs are filed that the appellants will argue fact issues, as Appellants do here. This Court should dismiss.

## III.    ACCEPTING KOH'S FACTS, APPELLANTS COERCED KOH TO INCRIMINATE HIMSELF IN VIOLATION OF CLEARLY ESTABLISHED LAW

If this Court looks past the jurisdictional problems, it must address the merits based on Koh's facts, with inferences drawn in his favor. Viewing the record that way, the legal questions are easy. Indeed, this Court has resolved those questions conclusively and repeatedly in Koh's favor. *Hurt*, 880 F.3d at 848 ("The rule forbidding such conduct has been established for decades."); see also *Jackson*, 888 F.3d at 263–65; *Carrion v. Butler*, 835 F.3d 764 (7th Cir. 2016); *Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir. 2011); *Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006); *Andersen v. Thieret*, 903 F.2d 526 (7th Cir. 1990).

Each Appellant violated Koh's Fifth Amendment rights by forcing him to incriminate himself involuntarily. Indeed, Ustich and Graf concede the point. Ustich 31 (noting they did not seek summary judgment on the "question of whether Mr. Koh voluntarily confessed"). Moreover, Appellants' tactics, which exploited Koh's known mental and physical vulnerabilities and overbore his will, violated clearly established law. If this Court addresses the merits, it should affirm.

## A.    Legal Standards

To defeat a claim of immunity in an interlocutory appeal, a plaintiff must show that: (1) his version of the facts establishes a constitutional violation; and (2) the right violated was clearly established. *Hurt*, 880 F.3d at 841. The plaintiff "cannot rest on glittering generalities"; he must make a showing "grounded in the particular context in which the problem arises." *Id.*[10]

Appellants encountered Koh in an extremely vulnerable mental and physical state; isolated him for hours without sleep, medication, food, contact with his lawyer, friends, family, or clergy; and subjected him to high-pressured and seemingly unyielding questions in a language he did not understand. Appellants did all this *in 2009*—not some bygone era. For more than a century it has been clear that criminal defendants may not be prosecuted with statements coerced by police. *Miller v. Fenton*, 474 U.S. 104, 109–10 (1985); *Brown v. Mississippi*, 297 U.S. 278 (1936); *Bram v. United States*, 168 U.S. 532, 542 (1897). The Constitution requires a

---

[10] Kim contends he is entitled to immunity unless he violated law that was clearly established *by a holding of the Supreme Court*. Kim 28–31. Ustich and Graf make no such argument. Kim's argument confuses the exacting standard imposed in federal habeas cases, 28 U.S.C. §2254(d); *Harrington v. Richter*, 562 U.S. 86 (2011), with the law governing qualified immunity. Qualified immunity considers both Supreme Court and circuit precedents, as well as other relevant cases demonstrating that the right in question was sufficiently clear to put reasonable officials on notice. *Jacobs v. Chicago*, 215 F.3d 758, 766–67 (7th Cir. 2000). Kim's argument also contradicts this Court's repeated statement that "[i]t is of no moment that the Supreme Court has never expressly held that this conduct violates the Constitution; it is enough that officials have 'fair and clear warning' that their conduct is prohibited under earlier precedents." *Whitlock*, 682 F.3d at 567. And Kim's argument cannot be reconciled with the Supreme Court's own statement that "officials can still be on notice that their conduct violates established law even in novel factual circumstances" without an analogous case. *Hope v. Pelzer*, 536 U.S. 730, 739–41 (2002).

confession to be "'the product of an essentially free and unconstrained choice by its maker.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973); *Davis v. North Carolina*, 384 U.S. 737, 739 (1966) ("made freely and voluntarily"); *Malloy v. Hogan*, 378 U.S. 1, 7 (1964) (suspect must have "free choice to admit, to deny, or to refuse to answer"); *id.* at 8 (confession must be made "in the unfettered exercise of his own will"); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961); *Payne v Arkansas*, 356 U.S. 560, 567 (1958); *Watts v. Indiana*, 338 U.S. 49, 53 (1949). Where a suspect's will is overborne the confession is infirm, no matter whether the coercion was physical, psychological, or the product of "deceptive interrogation tactics." *Conner v. McBride*, 375 F.3d 643, 651 (7th Cir. 2004); *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir. 1989); see also *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).

The analysis considers "the totality of the circumstances, including both the characteristics of the accused and the nature of the interrogation." *Hurt*, 880 F.3d at 845; see also *Haynes v. Washington*, 373 U.S. 503, 513 (1963). Factors considered include the suspect's age, education and intelligence; the length of the detention; and whether law enforcement advised the suspect of his constitutional rights, engaged in repetitive and prolonged questioning, or used physical punishment such as depriving the suspect of food or sleep. *Schneckloth*, 412 U.S. at 226. "[W]hen an interrogation is infected with numerous problems, a full trial may be necessary before a final characterization of the process is possible." *Hurt*, 880 F.3d at 847.

Whether the tactics used by the police were too coercive, and the confession involuntary, is a legal question "[b]ut the answer depends on underlying historical

facts." *Id*. at 846. The question for this Court is "whether, taking the facts and inferences favorably to the [plaintiff], any reasonable officer would have known that he was applying impermissible pressure." *Id*. at 847.

While physical abuse "may be the ultimate coercion," the "Supreme Court has long acknowledged the potency of psychological coercion as well." *Id*. at 845. This latter form may sometimes be obvious, but oftentimes "is the consequence of the cumulative effect of subtle tactics." *Id*. at 846. Prior to Koh's interrogation, the following tactics had been clearly established as "applying impermissible pressure":

- *Exploiting Mental Impairment*

  *Culombe v. Connecticut*, 367 U.S. 568, 581 (1961) (describing the "[c]ardinal . . . conviction, basic to our legal order, that men are not to be exploited for the information necessary to condemn them before the law[.]"); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (confession involuntary where suspect "was evidently confused and unable to think clearly"); *Colorado v. Connelly*, 479 U.S. 157, 164–65 (confession is involuntary if "police exploited [suspect's] weakness with coercive tactics"); *United States v. Sablotny*, 21 F.3d at 752 (where suspect claims mental impairment, court determines whether investigators reasonably should have known suspect was "unusually susceptible to psychological pressure"); *United States v. Hall*, 93 F.3d 1337, 1346 (7th Cir. 1996) ("[i]f a defendant has a mental impairment that was known or reasonably apparent to interrogators, they must exercise special care"); *United States v. Huerta*, 239 F.3d at 871 (fatigue can be mental impairment).

- *Questioning a suspect who is in need of medication*

  *Greenwald v. Wisconsin*, 390 U.S. 519, 519–21 (1968) (confession coerced where police denied suspect his medication); *cf. United States v. Stott*, 245 F.3d 890, 902–03 (7th Cir. 2001) (suspect denied medication before giving confession that was admitted; no new trial because of plain-error standard and defense counsel's knowledge of medication denial).

- ***Failing to provide* Miranda *warnings or abide by a suspect's invocation of those rights***

  > *Haynes*, 373 U.S. at 510–11 (confession involuntary where no evidence suspect "was advised by authorities of his right to remain silent, warned that his answers might be used against him, or told of his rights respecting consultation with an attorney"); *Orozco v. Texas*, 394 U.S. 324, 326 (1969) ("[T]he use of these admissions obtained in the absence of the required warnings was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in *Miranda*."); *Michigan v. Moseley*, 423 U.S. 96, 104–06 (1975) (voluntariness "depends under *Miranda* on whether [the] right to cut off questioning was scrupulously honored"); *United States v. Serlin*, 707 F.2d 953, 958 (7th Cir. 1983) (presumption of coercion if warnings not given); *Oregon v. Elstad*, 470 U.S. 298, 306 n.1 (1985) (same); *United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) (in determining whether a suspect waived *Miranda*, court considers suspect's background, experience and conduct); *Sornberger*, 434 F.3d at 1025 (Fifth Amendment violation where "*Miranda*-infirm statements" are used against defendant); *Aleman*, 662 F.3d at 905–06 (for a 2005 interrogation, use of confession "made the violation of *Miranda* actionable in a suit under section 1983"); *Johnson v. Winstead*, 900 F.3d 428, 434 (7th Cir. 2018) (permitting a §1983 claim based on a 2003 interrogation, noting claim "accrues when an accused's unlawfully obtained inculpatory statement—whether coerced or obtained without *Miranda* warnings—is introduced as evidence at trial to convict him of a criminal offense").

- ***Questioning a suspect after he invokes his right to counsel***

  > *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (confessions are *per se* involuntary if elicited through police-initiated questioning after a suspect invokes his right to counsel).

- ***Interrogating over an extended period of time***

  > *Fikes v. Alabama*, 352 U.S. at 195 (confession obtained over several two-to-three-hour interrogations found involuntary); *Sprosty v. Buchler*, 79 F.3d at 646 (length of detention and interrogation are factors to be considered in voluntariness analysis).

- ***Isolating a vulnerable suspect***

  *Haynes,* 373 U.S. at 514 (confession involuntary where suspect held *incommunicado* and denied permission to call his wife); *United States v. Sablotny*, 21 F.3d 747, 753 (7th Cir. 1994) (denying request made by mentally impaired person "would weigh heavily against a finding of voluntariness"); see also *Malloy v. Hogan*, 378 U.S. 1, 7 (1964).

- ***Fabricating facts and preventing a suspect from making a rational choice***

  *Weidner*, 866 F.2d at 963–64 (misrepresentations that prevent rational choice are constitutionally objectionable); *Alexander v. DeAngelo,* 329 F.3d 912, 918 (7th Cir. 2003) (fraud—as opposed to deceit—can give rise to a §1983 claim); *Sornberger*, 434 F.3d at 1011 (reversing summary judgment based on false information provided to suspect in effort to gain confession); see also *Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1251 (7th Cir. 1988) (deception, as part of the totality of circumstances, can invalidate a confession).

- ***Feeding a suspect the facts for his confession***

  *Fikes v. Alabama*, 352 U.S. 191, 195 (1957) (leading nature of interrogation supported finding of involuntary confession); *Spano v. New York*, 360 U.S. 315 (1959) (same).

- ***Using unwanted or unwarranted physical contact that could convey threat of physical violence***

  *Arizona v. Fulminante*, 499 U.S. at 287 (credible threat of violence is coercion); *Weidner*, 866 F.2d at 959 (implication of future physical force is improper).

- ***Conducting an adversarial interrogation to obtain a conviction, not to learn information***

  *Spano*, 360 U.S. at 324 ("the most careful scrutiny" required where police were not "merely trying to solve a crime," but were "concerned primarily with securing a statement from defendant on which they could convict him").

- ***Categorically rejecting suspect's testimony because it is not incriminating***

> *Chambers v. Florida*, 309 U.S. 227, 240 (1940) (when interrogators flatly reject suspects' testimony because it is not inculpatory enough, that "relentless tenacity" can break suspects' wills and "render[] them helpless to resist their accusers further").

## B.    Appellants Violated Koh's Fifth Amendment Rights

The district court correctly held that a reasonable jury could conclude Appellants coerced a confession from Koh in violation of the Fifth Amendment. The totality of the circumstances—including Koh's known mental and physical vulnerabilities and the tactics used by Appellants—demonstrate the propriety of that holding.

### 1.    Several Factors Known to Appellants Rendered Koh Unusually Susceptible to Psychological Pressure

As the district court found, several factors known to Appellants rendered Koh unusually susceptible to psychological pressure and resulted in an involuntary confession. A.36–40; *Sablotny*, 21 F.3d at 752. First, Appellants knew Koh had an extremely limited ability to communicate in English. Indeed, before beginning the interrogation, Kim was summoned to interpret. On the video, the language barrier is patently obvious.

Second, Appellants knew Koh was sleep-deprived, traumatized, and in shock. They knew that just hours before the interrogation began, Koh had woken to find his wife screaming and son lying bleeding with serious wounds. Despite Koh's 911 calls for help, police made matters worse, treating Koh like a murderer and adding to his shock. The district court observed that Koh's sleep deprivation and shock

were apparent to Appellants. A.37. Throughout the interrogation, Koh "displayed signs of mental and physical exhaustion: he sat hunched over in his chair, occasionally hitting himself on the head and chest." *Id.* This did not stop Appellants from pushing forward.

Third, Appellants knew they had deprived Koh of needed medications for serious health problems. Koh specifically requested the medications, but Appellants withheld them until after Koh's interrogation, when his will was defeated and they had obtained incriminating statements.

Fourth, Appellants knew Koh had not eaten. While Koh—who was in shock and unfamiliar with police interrogations—denied an offer of food, based on the circumstances and Koh's physical appearance, any reasonable officer would have known that without food Koh could not answer questions "in the unfettered exercise of his own will." *Malloy*, 378 U.S. at 8.

According to medical experts, the combination of Koh's above-described susceptibilities confused him and impaired his memory, making him vulnerable to coercion. While Appellants knew of Koh's impairments (as evidenced by Graf's threatening demand that Koh keep the circumstances secret from the judge) they failed to "exercise special care," as required. See *Hall*, 93 F.3d at 1346. They did the opposite, exploiting Koh's impairments.

For instance, Appellants preyed on Koh's inability to understand English and the confusion it caused, quickly switching between topics; asking multiple questions at the same time but only translating a portion; mistranslating a Korean idiom to

make it appear as if Koh threatened to kill his son; ignoring the frequent incoherence or non-responsiveness of Koh's answers; and speeding up the pace and intensity when Koh's lawyer was near. Further, even though Appellants knew Koh had been awoken around 3:45 a.m. and subjected to tremendous psychological trauma, they chose to break him down. Instead, of letting Koh rest, take needed medications, or take a break during which he could have eaten, they isolated and exploited him, not allowing him to see any of the friendly faces that had arrived to offer support. Appellants hoped that in his fatigued, medicine-deprived state, Koh would be more malleable and willing to confess. *Mincey*, 437 U.S. at 398.

Appellants' only counter to their above-described conduct is to challenge the facts, which they cannot do at this stage. Argument §II, *supra*. Thus, without more, the totality of Koh's susceptibilities and mental impairments, which Appellants knew about, rendered his confession involuntary. See *Hurt*, 880 F.3d at 845; *Haynes*, 373 U.S. at 513. But as discussed below, there *was* more.

### 2.   Appellants' Coercive Tactics Resulted in Koh's Involuntary Confession

The district court also correctly found that Appellants employed numerous unconstitutional tactics in coercing Koh's confession. A.40–42. Appellants engaged in a textbook coercive interrogation, using myriad tactics that individually and collectively violated Koh's Fifth Amendment rights.

First, Appellants violated Koh's *Miranda* rights. Appellants never advised Koh of those rights and he never knowingly waived them. See *Serlin*, 707 F.2d at 958. While Graf read Koh his rights from a preprinted English form, Koh made

clear that he did not understand and requested Kim's assistance. But instead of translating, Kim provided incomplete and misleading warnings, not telling Koh that his statements could be used against him or that he had a right to an attorney (even if he could not afford one). Incredibly, Kim advised that Koh did *not* need a lawyer.[11]

Making matters worse, though Koh invoked his right to counsel, Appellants proceeded to interrogate him without a lawyer—a *per se* violation of the Fifth Amendment. *Smith v. Illinois*, 469 U.S. 91, 95 (1984); *Edwards*, 451 U.S. at 482; *Fare v. Michael C.*, 442 U.S. 707, 719 (1979).[12]

Second, Appellants impermissibly interrogated Koh over an extended period of time, keeping him isolated from family, friends and clergy. *Sprosty*, 79 F.3d at 646; *Haynes*, 373 U.S. at 514; *Blackburn*, 361 U.S. at 206 ("A prolonged

---

[11] *Miranda* warnings must be *effective*, not a "mere recitation." *Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (must "function effectively"); *id.* at 621–22 (Kennedy, J., concurring) ("reasonable person *in the suspect's situation*" must understand and cannot be "deprived of knowledge essential" to do so) (emphasis added); see also *Fikes*, 352 U.S. at 193 (whether suspect adequately warned "must be viewed in the light of the facts concerning [his] mentality and experience"); *Livers v. Schenck*, 700 F.3d 340, 352–53 (8th Cir. 2012) ("disputed fact for the jury" whether suspect understood warnings, given his comprehension difficulties). A language barrier is no excuse. See, *e.g.*, *United States v. Botello-Rosales*, 728 F.3d 865, 867 (9th Cir. 2013) (warnings inadequate because Spanish translation was misleading); *United States v. Perez-Lopez*, 348 F.3d 839, 847–49 (9th Cir. 2003) (same); *United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986) (German-speaking defendant may not have understood the English warnings).

[12] Koh was not allowed to call his attorney because he did not have the phone number and Graf would not let him get it from friends or family. That tactic has long been held to be coercive. See *Culombe*, 367 U.S. at 609, 630 (suspect did not know the phone number and officer knew he could not read the phone book); *Haynes*, 373 U.S. at 508 (suspect wanted to call his wife "so that she might secure a lawyer for him").

interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror."). Koh's interrogations totaled about 2.5 hours, but he was isolated before and between sessions so by the end he had been detained for more than nine hours. Except for five minutes upon arrival, Appellants kept Koh totally isolated, despite his requests to make a phone call and requests made by his friends, family and clergy to speak with him.

Third, as the district court found, A.42 & n.34, Appellants crossed the line from being permissibly misleading to outright coercing a confession by, among other things, badgering, pressuring, lying to, and manipulating Koh, rendering him incapable of making a rational choice. Despite the clear evidence of suicide, Appellants repeatedly and falsely told Koh his son had been murdered and that the evidence—including his own wife's testimony—implicated Koh.

Fourth, Appellants impermissibly fed Koh the "facts" they wanted him to falsely confess to. See *Spano*, 352 U.S. at 195. By that time, Appellants had overbore Koh's will, as evidenced by Koh's demonstrative confusion. See V2 at 42:15 (minutes after Koh regurgitated Graf's story that Paul had come home after going out, Koh *asks* Kim whether that is what the interrogators are saying happened). *Cf. Hurt*, 880 F.3d at 837 (suspect asking whether he was "getting close" to the interrogators' version). As the district court found, Appellants "basically drafted the entire confession" by feeding Koh "every critical fact." A.45.

42

Fifth, Appellants made Koh fearful of physical violence and a torturously long interrogation. See *Fulminante*, 499 U.S. at 287; *Weidner*, 866 F.2d at 963–64; *Michigan v. Tucker*, 417 U.S. 433, 448–49 (1974) (coercion arises from the "simple desire on the part of a physically or mentally exhausted suspect to have a seemingly endless interrogation end"); *Miranda v. Arizona*, 384 U.S. at 468 (1966); *Haynes*, 373 U.S. at 514; *Culombe*, 367 U.S. at 575–76. Throughout the interview, Kim displayed his gun. As Graf became more desperate he raised his voice, impermissibly touched Koh and intimidated him by sitting just inches away. Similarly, as Graf became increasingly frustrated, he threatened to keep Koh there for "days and days and days" if he did not confess.

Finally, Appellants made clear that their purpose had nothing to do with discovering truth. Rather, their sole concern was to obtain a confession. See *Spano*, 360 U.S. at 324 ("the most careful scrutiny" required where police are primarily concerned with obtaining confession). To that end, Appellants ignored the evidence of suicide and refused to believe Koh's repeated denials. Appellants repeated the same questions, accusing Koh of lying, playing on his devout religious views by implying that God wanted him to confess, and ordering him to be "totally honest" to "get closure" for his dead son. *Chambers*, 309 U.S. at 240.

As this Court recognized in *Hurt*, the cumulative effect of Appellants' tactics resulted in a coerced false confession. 880 F.3d at 846. This conclusion is underscored by the fact that Graf and Ustich do not even contest the coerced nature

of the confession, and Kim's challenge is improperly fact-based. See Argument §III.B.3, *infra*.

### 3.    Kim's Arguments Are Unpersuasive

Ignoring his conduct during Koh's interrogation—and the district court's findings regarding that conduct—Kim contends he did not violate Koh's Fifth Amendment rights. Kim 16. As a threshold matter, the contention that he is absolved because he was a mere interpreter is meritless. See *Estelle v. Smith*, 451 U.S. 454, 467 (1981) ("That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial.").

The facts also belie the argument. While Kim asserts the district court relegated his conduct to two short sentences (Kim 16), that is not the case. The court made numerous findings about Kim's improper tactics, including:

- "Officer Kim, for his part, provided little translation assistance to Mr. Koh throughout the entirety of the interviews." A.38.

- "Officer Kim's lack of assistance even prompted Mr. Koh to plead with Detective Graf, 'I need this interpreter over here.'" A.38.

- Accepting Koh's facts, "what language assistance Officer Kim did provide made the circumstances even more coercive." A.38 (highlighting Kim's improprieties with respect to *Miranda*).

- "Officer Kim even joined in the interrogation by asking his own questions in English." A.39.

- "[T]here were instances where Officer Kim would translate (or mistranslate) some, but not all, of Mr. Koh's statements, or interject in Korean with questions of his own." A.39 (providing examples).

- "It is also worth noting that Officer Kim's gun was visible throughout the entirety of Mr. Koh's interviews." A.41.

Kim played an important role from beginning to end.[13] In addition to these bullet-points, Kim falsely told Graf that Koh admitted to killing Paul in self-defense; Kim falsely told Koh his wife had implicated him; and Kim purposefully converted an innocent idiom into a devastatingly incriminating literal statement, see *Carrion*, 835 F.3d at 776 (evidence that police translator "manipulated or mistranslated [] questions or [] answers is relevant to the extent that it demonstrates coercive conduct").[14]

Recognizing that the facts, viewed properly, do not support qualified immunity, Kim resorts to improperly viewing them in his own favor. Kim 19–21. As discussed in Argument §II, *supra*, that is improper. And Kim's citation to utterly irrelevant cases, Kim 32, do not help him either. See *United States v. Romo-Chavez*, 681 F.3d 955, 959–961 (9th Cir. 2012) (neither the Confrontation Clause nor rule

---

[13] Ustich does not argue he should be treated differently than Graf—throughout their brief, Ustich and Graf rightly concede that they conducted the interrogation together and that Ustich played an important role. Ustich 5–23, 28–49. Any such argument is waived and it will be too late to raise it in reply. *Darif v. Holder*, 739 F.3d 329, 336 (7th Cir. 2014). Moreover, as discussed, the district court denied summary judgment on Koh's claims that Appellants conspired to violate his constitutional rights and that Ustich and Kim failed to intervene to prevent the violation. A.18–20, 44 n.36, 63. Those claims have not been appealed. Jurisdictional Statement, *supra*.

[14] Kim notes that *Carrion* issued after Koh's interrogation. It strains credulity to think Kim had to read that opinion before he knew it was unlawful to purposefully "manipulate[] or mistranslate[]"statements to make them more incriminating. It is not the case that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Hope*, 536 U.S. at 739. It is "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id*. at 741; *United States v. Lanier*, 520 U.S. 259, 271 (1997) (a "general constitutional rule" may "apply with obvious clarity to the specific conduct in question"); *Hurt*, 880 F.3d at 846 (question is whether "any reasonable officer would have known that he was applying impermissible pressure").

against hearsay bars confession from being presented through interrogating officer rather than translator who facilitated interrogation); *Martinez Camargo v. I.N.S.*, 282 F.3d 487, 493 (7th Cir. 2002) (during legal stop, it does not violate the Fourth Amendment to ask "routine biographical questions" in Spanish). Nothing in those cases, or Kim's brief, justifies his conduct or warrants a result different than for Ustich and Graf.

### C.    Prior to Koh's Interrogation, It Was Clearly Established that Interrogators Could Not Deploy Appellants' Barrage of Coercive Tactics on a Vulnerable Person

Appellants contend that it was not clearly established that the multiple tactics they used to coerce Koh's confession violated the Fifth Amendment. Ustich 30–46; Kim 23–42. As Appellants do throughout, they base their contention on an improper view of the facts. See *id.*; Argument §II, *supra*.

Accepting Koh's facts, the authority in Argument §§III.A–B shows that police cannot employ the myriad impermissible tactics Appellants used to obtain Koh's confession. All that authority discusses the constitutional right at a tactic-specific level, particularized for this case, rather than at a high level of generality. See *Hurt,* 880 F.3d at 841. Koh does not rely on the glittering generality that officers cannot "coerce confessions," or "overbear his will," or "shock the conscience." His showing is "grounded in the particular context in which the problem arises." *Id.* Koh cited cases showing the tactics Appellants used have long been individually and collectively condemned as overly coercive.

Moreover, all the authority relied on, with the exception of *Hurt*, issued before Koh's interrogation. And *Hurt* did not announce a new rule: it was a

qualified-immunity case that relied exclusively on pre-2009 cases. 880 F.3d at 845. The only post-2009 case cited is *Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017), which the Court *distinguished* because it applied the very deferential standard required by the Antiterrorism and Effective Death Penalty Act. *Hurt*, 880 F.3d at 846. That statute was not applicable in *Hurt*, and it is not applicable here, so Appellants' reliance on it is unavailing.

Nor are Appellants aided by *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017). *Gill* was decided at the motion-to-dismiss stage because the plaintiff failed to plead, at the appropriate level of specificity, that the particular interrogation tactics used violated the Constitution. *Id*. at 340. The plaintiff merely *asserted* that in light of his diminished mental capacity, the tactics "shocked the conscience" and were unconstitutional—but he did not identify specific tactics and corresponding case law. *Id*. *Gill* has no application here: we are far beyond the pleadings, and the evidence and arguments developed, and the extensive case law cited in Argument §III, show that the particular tactics Appellants used violated Koh's constitutional rights as those rights were established before 2009.

Furthermore, under Koh's facts and with inferences in his favor, Appellants *knew* their conduct was impermissible.[15] Officers who knowingly violate the law are not protected by qualified immunity. *Sornberger*, 434 F.3d at 1014 ("[T]he qualified

---

[15] Several facts show Appellants knew their conduct was impermissible, including: (i) they misused the Reid technique, contrary to their training; (ii) *Miranda* is so well-known it is "part of our national culture," *Dickerson v. United States*, 530 U.S. 428, 443 (2000), yet Appellants did not follow it; (iii) Appellants raced to finish before an attorney could observe; and (iv) Appellants threatened Koh to keep the circumstances secret from the judge.

immunity doctrine does not protect those who act unreasonably or 'who knowingly violate the law.' . . . [A] public official's actions are not protected [if he] knew or should have known he was violating an individual's constitutional rights.").

Appellants knew, and any reasonable officer would have known, that Appellants' use of a barrage of outlawed tactics violated Koh's clearly established rights. Appellants are not entitled to immunity.

## IV. APPELLANTS' CAUSATION ARGUMENT IS UNRELATED TO QUALIFIED IMMUNITY AND IS MERITLESS

Last, Appellants contend that the state criminal court's denial of Koh's motion to suppress is a superseding cause that negates liability. Ustich 46–49. In *Jackson*, this Court rejected the identical argument:

> [A]s the officers admit, we have not accepted this argument in the context of a Fifth Amendment coerced-confession claim. We presently lack jurisdiction over the superseding-cause issue as it is not a pure legal question relating to qualified immunity.

888 F.3d at 266. This conclusion applies here as well.

First, this Court lacks jurisdiction to consider superseding causation, despite Appellants' attempt to call it a qualified-immunity issue. The question whether third-party actors intervened to cause a violation of Koh's rights that was an unforeseeable result of Appellants' own misconduct is a question that (1) necessarily involves fact disputes, and (2) is unrelated to the qualified-immunity question of whether Appellants violated Koh's clearly established rights. *Armstrong v. Daily*, 786 F.3d 529, 537–38 (7th Cir. 2015); see *Ortiz*, 562 U.S. at 188; A.48 n.38.

Second, this Court has repeatedly rejected this argument on the merits. Appellants rely on *Murray v. Earle*, 405 F.3d 278 (5th Cir. 2005), but ignore that

*Murray* is at odds with Supreme Court and Seventh Circuit precedent. The decision of a judge or prosecutor to use evidence does not supersede to break the chain of causation between a police officer's misconduct and the constitutional harm that results. *Manuel v. City of Joliet*, 137 S.Ct. 911, 919–20 & n.8 (2017) (legal process does not break chain); *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (judge's issuance of arrest warrant does not break chain); *Whitlock*, 682 F.3d at 582–83 (prosecutor's introduction of evidence does not break chain); see also *Dennis v. Sparks*, 449 U.S. 24, 28–29 (1980); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014); *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007). This is a straightforward application of basic tort principles, which provide that a superseding cause is one that renders the consequences of a tortfeasor's action *unforeseeable*, which is plainly not the case here. *Whitlock*, 682 F.3d at 584.[16]

## CONCLUSION

For the foregoing reasons, Koh respectfully requests that this Court dismiss for lack of jurisdiction. To the extent the Court does not dismiss, it should affirm.

RESPECTFULLY SUBMITTED,

 s/ Tony Balkissoon
*Counsel for the Kohs*

Arthur Loevy
Jon Loevy

---

[16] Appellants assert they are not asking for claim preclusion, but the distinction they draw is empty formalism. Accepting their argument would mean that whenever a state criminal judge denies a motion to suppress, that decision forever forecloses police liability for obtaining the confession, even if it was unconstitutionally coerced. That is an argument about the preclusive effect of a state-court judgment, and it is an argument this Court has rejected. *Sornberger*, 434 F.3d at 1022–23; *Evans v. Katalinic*, 445 F.3d 953, 955 (7th Cir. 2006).

Tony Balkissoon
Scott Drury
Steven Art
Loevy & Loevy
311 N. Aberdeen St.
Third Floor
Chicago, Illinois 60607
(312) 243-5900
tony@loevy.com

## CERTIFICATE OF COMPLIANCE WITH
## CIRCUIT RULE 32(c)

I, Tony Balkissoon, hereby certify, pursuant to Circuit Rule 32(c), that the

foregoing RESPONSE BRIEF OF PLAINTIFFS-APPELLEES HYUNG SEOK KOH

AND EUNSOOK KOH complies with the type-volume limitation set forth in Circuit

Rule 32(c) because it contains 13,978 words, excluding those portions of the brief

listed in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) that do not count

toward the word limitation. In preparing this certificate, I relied on the word count

tool of the word-processing system used to prepare the brief, Microsoft Word 2007.

s/ Tony Balkissoon
*Counsel for the Kohs*

Arthur Loevy
Jon Loevy
Tony Balkissoon
Scott Drury
Steven Art
Loevy & Loevy
311 N. Aberdeen St.
Third Floor
Chicago, Illinois 60607
(312) 243-5900
tony@loevy.com

**CERTIFICATE OF COMPLIANCE WITH**
**THIS COURT'S ELECTRONIC CASE FILING PROCEDURE (C)(3)**

I, Tony Balkissoon, hereby certify that I have filed the RESPONSE BRIEF

OF PLAINTIFFS-APPELLEES HYUNG SEOK KOH AND EUNSOOK KOH

electronically in searchable PDF format, as required by this Court's electronic case-

filing procedure (c)(3).

          s/ Tony Balkissoon       
          *Counsel for the Kohs*

Arthur Loevy
Jon Loevy
Tony Balkissoon
Scott Drury
Steven Art
Loevy & Loevy
311 N. Aberdeen St.
Third Floor
Chicago, Illinois 60607
(312) 243-5900
tony@loevy.com

## CERTIFICATE OF SERVICE

I, Tony Balkissoon, hereby certify that I served the RESPONSE BRIEF OF

PLAINTIFFS-APPELLEES HYUNG SEOK KOH AND EUNSOOK KOH on

December 19, 2018, using the CM/ECF system, which effected service on all counsel

of record for the Defendants-Appellees.


                                        s/ Tony Balkissoon
                                        *Counsel for the Kohs*

Arthur Loevy
Jon Loevy
Tony Balkissoon
Scott Drury
Steven Art
Loevy & Loevy
311 N. Aberdeen St.
Third Floor
Chicago, Illinois 60607
(312) 243-5900
tony@loevy.com